UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE KIRKLAND, JR.,

          Plaintiff,                    CIVIL ACTION NO. 12-15275

                                   DISTRICT JUDGE NANCY G. EDMUNDS

          v.                        MAGISTRATE JUDGE MARK A. RANDON

MARVIN KEELING,
JOHN KEARNEY, and
THOMAS BIRKETT,

          Defendants.
_____/

**REPORT AND RECOMMENDATION TO: (1) GRANT MARVIN KEELING, M.D.'S MOTION TO DISMISS; (2) DENY JOHN KEARNEY, P.A.'S MOTION TO DISMISS; AND, (3) GRANT THOMAS BIRKETT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This is a *pro se* prisoner civil rights case. Plaintiff, George Kirkland, Jr., requests $1,500,000.00 in damages for Defendants' actions in failing to remove his eye implant; and, improperly treating his broken ankle, and athlete's foot.

Defendant John Kearney, P.A. filed a motion to dismiss (Dkt. No. 16),[1] and retired Warden Thomas Birkett filed a motion for summary judgment (Dkt. No. 25). Defendants' motions have been fully briefed (Dkt. Nos. 32-33, 35); the Court dispenses with oral argument. *See* E.D. Mich. LR 7.1(f)(2). Because Kirkland's Complaint only states a plausible claim upon which relief can be granted against Kearney, and there is no question of material fact regarding whether Birkett was deliberately indifferent to Kirkland's medical needs, this Magistrate Judge

_____

[1]Marvin Keeling, M.D. joined in Kearney's motion (Dkt. No. 37).

-1-

**RECOMMENDS** that Kearney's motion be **DENIED** (as it relates to the treatment of Kirkland's broken ankle only); and, Dr. Keeling and Birkett's motions be **GRANTED**.

## II.     BACKGROUND[2]

### A.     *Removal of Kirkland's Implant in his Left Eye*

Before he was incarcerated for operating while intoxicated ("OWI"), Kirkland saw his treating Ophthalmologist, Murray D. Christianson, M.D., at Henry Ford Hospital in Detroit, Michigan once a month (Dkt. No. 1 at p. 6).[3]  On January 16, 2011, Dr. Christianson put an implant in Kirkland's left eye (*Id.*).  At Kirkland's June 8, 2011 appointment with Dr. Christianson, he scheduled an appointment to have Dr. Christianson remove the implant on July 8, 2011 (*Id.*; Dkt. No. 32 at p. 10).

On June 17, 2011, Kirkland was arrested for OWI and taken to the Charles Egeler Reception and Guidance Center ("RGC") (Dkt. No. 1 at p. 6).  Kirkland informed the Medical Department ("Medical") that he had an implant in his left eye and that Dr. Christianson was scheduled to remove it on July 8, 2011.  He also showed Medical his appointment card with Dr. Christianson (*Id.*).  Medical personnel told Kirkland that he would be evaluated by an ophthalmologist at RGC (*Id.* at p. 7).

On August 9, 2011, Kirkland saw Ghulam Dastgir, M.D., an ophthalmologist at RGC (*Id.*).  Dr. Dastgir's Consultation Note says:

> On exam, [Kirkland's] best corrected visual acuity was found to be 20/25 in the right eye and 20/70 -1 in the left eye.  Tension was recorded at 18 mm. of

---

[2] The facts are viewed in the light most favorable to Kirkland.

[3] All page numbers refer to CM/ECF pagination.

Mercury in both eyes. Examination of [Kirkland's] lids shows almost complete ptosis of the left upper lid.[4] The right lids are normal. Examination of the nasolacrimal duct system was normal in the right eye but in the left eye, [Kirkland] has a nasolacrimal duct tube from [a] previous dacryocystorhinostomy operation which is in place, <u>which really needs to be removed</u>. Examination of the conjunctive and sclera was normal. Examination of the cornea shows clear corneas in both eyes. The anterior chambers were deep and clear. The pupils were normal in both eyes. Lens exam showed early cortical and nuclear cataract in the right eye. In the left eye, [Kirkland] has a dense nuclear, cortical and posterior subcapsular cataract. Fundus exam was done after dilating the pupils with Mydriacyl and Neo-Synephrine and a detailed exam was done. [Kirkland's] vitreous is clear. The optic disk shows about 5% cupping. The macula, retina and blood vessels are all normal. Motility studies revealed orthophoria.

IMPRESSION:

1. Dense nuclear cortical and posterior subcapsular cataract of the left eye.

2. [N]asolacrimal duct tube in the left eye in the tear duct system from previous dacryocystorhinostomy operation.

3. Almost complete ptosis of the left upper lid.

PLAN: After fully and thoroughly explaining all the risks and benefits of the procedure and answering all [of Kirkland's] questions to his satisfaction, [Kirkland] decided to have the nasolacrimal duct tube removed from the left eye and cataract extraction with lens implant performed in the left eye and was scheduled for the same. There is [a] reasonable expectation of improved results providing there are no complications during the procedure for which [Kirkland] was made fully aware of, and it is after these considerations that he decided to have the procedure performed on the left eye. When he comes to the Parkside Eye Clinic, he will have the A scan and removal of the nasolacrimal duct tube and then will go to the Blake Woods Surgery Center for cataract extraction with lense implant in the left eye.

(Dkt. No. 32 at p. 20) (underline in original).

---

[4]"Eyelid drooping is excess sagging of the upper eylid[sic]. The problem is also called ptosis." *See* http://www.nlm.nih.gov/medlineplus/ency/article/001018.htm (last visited August 6, 2013).

On September 12, 2011, Kirkland was transferred to the Central Michigan Correctional Facility ("STF") in St. Louis, Michigan (Dkt. No. 1 at p. 7).  Upon his arrival, Kirkland informed the nurse that his eye implant needed to be removed; the nurse scheduled him to see Marvin Keeling, M.D.  Dr. Keeling worked part-time at STF, and it was difficult for Kirkland to keep his appointment (*Id.* at p. 8).  In the meantime, Dr. Christianson wrote a letter to Kirkland on November 3, 2011:

> [Y]ou had extensive surgery on your eyelids on January 16, 2011.

> \*     \*     \*

> When I last saw you on June 10, 2011, it was slowly improving.  The left upper lid was still ptotic, but it was getting better and I wanted to wait and see how much it improved by itself before planning any surgery to correct the residual droop.

> The Crawford tubes, which are the silicone tubes in your tear drainage system on the left side, will need to be removed, but this is not an urgent requirement.  It may be that when these tubes are removed the upper lid will go up, but because the lifting mechanism was badly damaged, the lid may still be droopy and may require a repair eventually.

> It would be useful to assess you to make sure all is well and I would be pleased to see you if it is possible for the Correctional Facility to bring you here.  St. Louis is some distance from Detroit and I do not know how long you will be [a] resident there.  I would be pleased to discuss this with your Medical Department should they wish to call me[.]

(Dkt. No. 32 at pgs. 12-13).  Kirkland showed Dr. Keeling this letter at his appointment.  Dr. Keeling recommended that Kirkland return to Dr. Christianson to have the implant removed, but the recommendation was not approved (Dkt. No. 1 at p. 10).  Dr. Keeling also prescribed Claritin (an allergy medication) (*Id.*) and told Kirkland that he was "not that medically experienced with

-4-

the human eye" (Dkt. No. 32 at p. 5).  Kirkland told Dr. Keeling that he needed to see an

ophthalmologist and Claritin would not solve his problem (Dkt. No. 1 at p. 10).

Kirkland's sister, Dolly Porter, scheduled an appointment for Kirkland to see Dr.

Christianson on March 16, 2012 (*Id.*).  In a letter dated February 10, 2012, Dr. Christianson

confirmed Kirkland's appointment for a "reassessment of his left eyelid and lacrimal

reconstruction done last year, and for possible removal of his left lacrimal stent" (Dkt. No. 32 at

p. 11).  Dr. Christianson sent Warden Birkett a copy of the letter (*Id.*), and Kirkland sent Birkett

and Medical a note asking if he could keep his March 16, 2012 appointment, or if he should

reschedule the appointment.  Kirkland did not receive a response (Dkt. No. 1 at pgs. 11-12).

Subsequently, Kirkland filed a grievance against Birkett for refusing to take him to his

appointment with Dr. Christianson on March 16, 2012 (*Id.* at p. 12).  On April 11, 2012,

Kirkland saw Donald Haiderer, O.D., an Optometrist at STF.  Dr. Haiderer recommended that

Kirkland be evaluated in Ophthalmology (*Id.* at pgs. 12-13).

On February 14, 2013, Dr. Christianson wrote Birkett a letter that says:

I received a letter today from Mr. Kirkland.  It is dated January 27, 2013.

[Kirkland] is concerned about the Crawford tube, which was placed at the time of
repair of his eyelid injuries and lacrimal system injuries on January 16, 2011.

I have not seen [Kirkland] since the 9th of August 2011.[5]  Under ordinary
circumstances, this tube would have been removed some time ago, but [Kirkland]
has been incarcerated.  It is not possible for me to tell without examining him

---

[5]This date is incorrect; Kirkland was incarcerated in August of 2011.  The last time
Kirkland saw Dr. Christianson was in June of 2011 (Dkt. No. 1 at p. 6 (CM/ECF); Dkt. No. 35 at
p. 2 (CM/ECF)).

whether the tube is causing any difficulty, but I would recommend that he be reviewed by a local ophthalmologist if he is unable to come to see me.  The tube can be cut and simply pulled out as it is tied with only a very small knot in the nose.  The small knot should come through the lacrimal canaliculi.

If the local ophthalmologist feels that the tube is in good position and not causing any difficulty then there is probably no harm in leaving it there as long as it is checked regularly.

(Dkt. No. 32 at p. 21).

In April of 2013, Kirkland saw Dr. Joseph Burtch, who replaced Dr. Keeling at STF (Dkt. No. 35 at p. 4).  Dr. Burtch recommended that Kirkland see an ophthalmologist.  After this recommendation was denied, Dr. Burtch referred Kirkland to an optometrist (*Id.* at pgs. 4-5).  Dr. Burtch told Kirkland that "the reason that [Michigan Department of Corrections ("MDOC")] personnel denies [his] ophthalmolgy[sic] visit is because the situation is not life threatening and [he] ha[s] two eyes and if one is lost[,] [he] ha[s] use of the other one" (Dkt. No. 35 at p. 5).

Kirkland was transferred to the Ojibway Correctional Facility in May of 2013; he saw an optometrist on May 21, 2013 who gave him a prescription for eyeglasses and referred him to the Ophthalmology Department for an evaluation (*Id.* at p. 5).

Kirkland says that despite his constant complaints to Medical about his eye, his implant has not been removed.  Kirkland has a small red bump on his lower eye lid; his lower eyelid is drooping to where the inner lid is visible; the inner corner of his eye is red and itches "terribly" at night; and, his eye is tearing, burning and itching (Dkt. No. 1 at pgs. 8, 10, 13).  According to

Kirkland, his implant should have been removed by January 16, 2012 - a year after it was

inserted (*Id.* at p. 10);[6] *see also* Dkt. No. 32 at p. 14 (Step III Grievance):

> Since [Kirkland] missed [his] 7/08/2011 appointment to have the implant
> removed, [he] was concerned about how long . . . the implant [could] remain in
> [his] eye. [Kirkland's] family members intervened and contacted the
> Ophthalmologist who performed the surgeries [Dr. Christianson] and was
> informed [that] the implant was to be removed within one year from [the] date of
> surgery.

### B.      *Kirkland's Broken Left Ankle*

Kirkland broke his left ankle in January of 2011; he was placed in an ankle support boot,

had a support wrap on his ankle, and used crutches for support (Dkt. No. 1 at p. 13).  When

Kirkland arrived at STF, he explained to P.A. Kearney that he could not wear his support boot in

the winter, because his toes were exposed; and, the support wrap prevented him from wearing

the state-issued shoes (*Id.*).  Kearney told Kirkland that he would order him tennis shoes; and, he

took Kirkland's crutches, gave him a walking cane, and told him to wear the state-issued shoes

without the support wrap (*Id.* at pgs. 13-14); *see also* Dkt. No. 35 at p. 14 ("[t]he request for

shoes was deferred by the regional medical director on 10/6/11").  Within a week, Kirkland's left

ankle was swollen.  Kearney would not return Kirkland's support boot – which RGC allowed

---

[6]As of June 3, 2013, the implant has not been removed (Dkt. No. 35 at p. 2).

Kirkland to wear.  Kearney prescribed Naprosyn[7] for Kirkland's pain, ordered an X-ray of his

ankle,[8] and told him the tennis shoes were not approved (Dkt. No. 1 at pgs. 13-14).

        Kirkland's ankle has not been examined by an orthopedic surgeon, he has not had

physical or occupational therapy, and he has pain when he walks; he walks with a limp, and his

ankle is constantly swollen.  Kirkland eventually purchased his own tennis shoes (*Id.* at p. 15).

        **C.      *Kirkland's Athlete's Foot***

        On January 4, 2012, Kirkland developed athlete's foot (Dkt. No. 35 at p. 19) ("[Kirkland]

was treated for athlete's foot while in quarantine at RGC.  The problem has come back. . . .

There are big sores on [his] toes").  Dr. Keeling prescribed ketoconazole 2% cream,[9] but the

infection worsened (Dkt. No. 1 at p. 15).  He subsequently ordered an antibiotic for Kirkland, but

puss started to come out of a growth on his fourth toe (*Id.* at p. 16).  Kearney ordered a

medicated foot solution soak that made the growth disappear, but it returned on his fourth and

fifth toes approximately one month later (*Id.*).  A nurse again prescribed ketoconazole 2% cream,

and Kirkland's request to have cultures taken of the growth was denied (*Id.*).  Kirkland used the

---

        [7]"Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug (NSAID).  Naproxen
works by reducing hormones that cause inflammation and pain the body.  Naprosyn is used to
treat pain or inflammation caused by conditions such as rheumatoid arthritis, osteoarthritis,
ankylosing spondylitis, tendinitis, bursitis, gout, or menstrual cramps."  *See*
http://www.drugs.com/naprosyn.html (last visited July 29, 2013).

        [8]Kirkland does not believe the X-rays were submitted for results; nothing appears in the
"result" section of the radiology report (Dkt. No. 1 at pgs. 14-15 (CM/ECF)).

        [9]"Ketoconazole topical is an antifungal medication.  Ketoconazole topical prevents
fungus from growing on your skin.  Ketoconazole topical is used to treat fungal infections of the
skin such as athlete's foot, jock itch, ringworm, and seborrhea (dry, flaking skin)."  *See*
http://www.rxlist.com/ketoconazole-cream-drug/patient-images-side-effects.htm (last visited
July 31, 2013).

cream for several months to no avail; the infection spread to Kirkland's big toe (*Id.*).  Kirkland

began taking an antibiotic for a scalp infection in June of 2013; this antibiotic cleared his

athlete's foot (Dkt. No. 35 at p. 8).

## III.   STANDARDS OF REVIEW

### A.   *Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the

complaint fails to state a claim upon which relief can be granted. When reviewing a motion to

dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to

the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the

plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not

accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v.

Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as

factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510

F.3d 631, 634 (6th Cir. 2007).  Dismissal is appropriate if the plaintiff failed to offer sufficient

factual allegations that make the asserted claim plausible on its face. *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007).

The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 556 U.S.

662, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to "state a claim to relief that is plausible on its face."
> [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has
> facial plausibility when the plaintiff pleads factual content that allows the court to
> draw the reasonable inference that the defendant is liable for the misconduct
> alleged. *Id.* at 556. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent

> with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.*, at 557 (brackets omitted).

*Id.* at 678.  A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

Complaints drafted by *pro se* litigants are held to less stringent standards than formal pleadings drafted by lawyers and will be liberally construed in determining whether the complaint fails to state a claim upon which relief could be granted.  *See e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991).  However, courts may not rewrite a complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999), nor may courts construct the plaintiff's legal arguments for him.  *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993).

### B.   Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

## IV.  ANALYSIS

It is well established that an inmate has a cause of action under 42 U.S.C. § 1983 against prison officials for "deliberate indifference" to his serious medical needs, because it constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). To succeed on a claim of deliberate indifference, Kirkland must satisfy two elements, an objective one and a subjective one. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991).

The objective element is satisfied by a showing that Kirkland had a serious medical need. *Id.* at 297; *Farmer v. Brennan*, 511 U.S. 825 (1994). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d

-11-

510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)).

The subjective element requires Kirkland to show that the official being sued had "a sufficiently culpable state of mind." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citation omitted). "To satisfy the subjective component, [Kirkland] must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *See Farmer*, 511 U.S. at 838. Deliberate indifference is characterized by obduracy and wantonness, not inadvertence or good faith error. *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992). Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle*, 429 U.S. at 106. Nor is Kirkland entitled to the "best" medical treatment available. *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978); *Irby v. Cole*, 2006 WL 2827551, at *7 (S.D. Miss. Sept. 25, 2006). Moreover, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, courts are reluctant to second guess medical judgments. *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).

###### A.     *Eye Implant*

Kirkland's Complaint against Dr. Keeling and Birkett is that they were deliberately

indifferent to his serious medical needs, because he has not seen an ophthalmologist to have his

eye implant removed:

(1)     "I have not seen or had an exam of [my] left eye by an opthalmologist[sic] since 08/09/2011" (Dkt. No. 1 at p. 8).

(2)     "[N]early two years has[sic] expired and [the] implant is still in [my] eye and I have not seen an ophthalmologist on the current condition of my eye since August 09, 2011" (*Id.* at p. 10).

(3)     "I told Dr. Keeling[] he is not an ophthalmologist and I have had extensive surgery on my eye and I need to see an ophthalmologist, a plain prescription for [C]laritan[sic] is not going to solve my problem" (*Id.*).

(4)     "I am having problems with [my] eye and need to see Dr. Christianson" (*Id.* at p. 11).

(5)     "I file[d] [a] grievance on Warden Birkett for refusal of transportation to [my] appointment at Henry Ford Hospital in Detroit for removal of [my] eye implant" (*Id.* at p. 12).

(6)     "[A]fter many complaints to the medical department, I am sent to see [an] optometrist, not an ophthalmologist as it should have been due to the extensive surgeries I have had on [my] left eye and the type of problems I am having [with my] left eye" (*Id.* at p. 12).

(7)     "I have not seen an ophthalmologist for treatment of my eye, or had any type of treatment for my left eye" (*Id.* at p. 13).

(8)     "My requests for treatment on [my] left eye is[sic] being ignored or no answer from medical department.  The [C]laritan[sic] was discontinued without notice" (*Id.*).

###### 1.     **Dr. Keeling**

Even assuming that the failure to timely remove Kirkland's eye implant constituted a

serious medical need, Kirkland cannot satisfy the subjective element as it relates to Dr. Keeling.

There is no evidence that Dr. Keeling subjectively disregarded a substantial risk of harm to

-13-

Kirkland.  Indeed, Kirkland admits that Dr. Keeling recommended that he see an

ophthalmologist, but the recommendation was denied:

(1)     "On my first appointment with Dr. Keeling . . . Dr. Keeling said[] he would recommend
        [a] visit to Dr. [Christianson's] office to have [the] implant removed.  This
        recommendation was later disapproved" (Dkt. No. 1 at p. 10).

(2)     "[O]n the very first appointment, Dr. Marvin Keeling took one look into my left eye
        without any type of medical instrument and advise[d] me [that] he [would] make a
        recommendation that I see Dr. Christianson for further evaluation of my left eye.  This
        recommendation was denied" (Dkt. No. 32 at p. 3).

(3)     "Dr. Keeling . . . made a comment to me that 'yes,' I have had extensive surgeries [on
        my] left eye[,] [and he] took a glance into my left eye and told me[] he would recommend
        a visit to Dr. Christianson['s] office for further examination of my eye, which was later
        denied" (*Id.* at p. 4) (underline in original).

(4)     "Dr. Marvin Keeling . . . referred me to an optometrist since my [o]phthalmologist
        appointment had been denied" (*Id.* at p. 5).

(5)     "I have seen Dr. Marvin Keeling on three separate occasions for my left eye.  First visit
        was for [a] recommendation to ophthalmology for removal of [my] eye implant.  Second
        visit was to tell me [the] recommendation to ophthalmology was denied.  Third visit was
        for itching, tearing, burning and left eyelid drooping and was referred to optometrist.  At
        this visit, Dr. Keeling prescribed [C]laritin, which is a[n] allergy medication I had used
        for years for a respiratory reaction to spring and summer seasons.  I told Dr. Marvin
        Keeling I need more attention to my left eye than a [C]laritin prescription because of the
        surgeries and related to [my] left eye.  Dr. Marvin Keeling told me to wait until a[n]
        evaluation [came] back from the optometrist and we would go from there.  There has
        been no further contact with Dr. Marvin Keeling on the condition of my left eye since
        this third visit and I have kited several times by health care requests" (*Id.* at p. 6).

(6)     "In December 2011, I complained to Dr. Marvin Keeling at the Central Michigan
        Correctional Facility medical department of [an] itching, tearing, burning sensation in
        [my] left eye and left eyelid drooping.  Dr. Marvin Keeling recommend[ed] I see [an]
        [o]phthalmologist and was denied by MDOC personnel.  Dr. Marvin Keeling referred me
        to see [an] [o]ptometrist" (Dkt. No. 35 at p. 4).

As an individual who "is not that medically experienced with the human eye," (Dkt. No. 32 at p.

5), Dr. Keeling could not have removed Kirkland's eye implant.  Further, Kirkland concedes that

"[Dr. Keeling is not an] ophthalmologist and do[es] not have the qualifications or credentials to

-14-

check the tube (implant)[] in [his] left eye to see if it is still in place. [Dr. Keeling] can only refer

[him] for [an] ophthalmology evaluation, which [he has] requested" (Dkt. No. 35 at p. 6).

Kirkland's claim against Dr. Keeling should be dismissed.

### 2.   Warden Birkett

#### a.   Deliberate Indifference

Kirkland's claim against Birkett likewise fails on the second element; Warden Birkett did

not subjectively disregard a substantial risk of harm to Kirkland by failing to transport Kirkland

to his appointment with Dr. Christianson on March 16, 2012.[10]  *See* MDOC Policy Directive

03.04.100FF:

> While the Department is responsible for providing prisoners with necessary health
> care services, prisoners may be allowed to receive health services by an outside
> [Qualified Health Professional] with prior approval of the Warden after
> consultation with the appropriate Regional Medical Officer.  A request which
> poses a custody and security concern shall be denied, including if custody
> coverage is unavailable.  If approved, the Warden is responsible for approving all
> security measures.

On March 1, 2012, Birkett sent Kirkland's sister a letter that says:

> Mr. Kikland will not be able to attend the scheduled appointment.  Prisoners may
> be allowed to receive health services by an outside provider, *with prior approval
> of the Warden after consultation with the appropriate Regional Medical Officer.*
> However, the Warden's Office was not contacted in this case.

> Multiple issues (safety, security, transportation, staffing, pre-payment of fees)
> must be considered prior to authorizing a request of this nature.  Please see the
> attached Policy Directive 03.04.100 (pages 6 and 7) for scheduling requirements
> and guidelines.

---

[10]While MDOC Policy Directive 03.04.100II allows an outside qualified health
professional to "examine a prisoner at one of the Department's institutions," Kirkland's
Complaint does not contain an allegation that Birkett was deliberately indifferent to his medical
needs by prohibiting Dr. Christianson from examining him at the prison.

(Dkt. No. 25, Ex. C at p. 16) (emphasis in original).  Birkett also presents an Affidavit that says:

> 11.    [I]n Ms. Porter's correspondence, the date, time and place of the medical visit was listed and that information was provided independently by the outside medical provider to Kirkland.

> 12.    MDOC Policy Directive 04.04.135 "Custodial Transportation of Offenders", which is exempt from public disclosure, mandates that such information is to be treated as confidential so the prisoner does not acquire advance knowledge of the move.  This is meant to prevent possible escape attempts and ensure staff safety during the transport.

(*Id.* at p. 4); *see also* MDOC Policy Directive 03.04.100H ("[o]ffenders shall not . . . schedule medical appointments") (*Id.* at p. 7).  Kirkland does not dispute that: (1) he did not have Birkett's approval before the appointment was scheduled; (2) there were concerns with safety, security, transportation, staffing, and fees; and, (3) he had advance knowledge of the date, time and place of the appointment, in violation of MDOC Policy.  Birkett simply complied with MDOC Policy.  Accordingly, Kirkland's deliberate indifference claim against Birkett lacks merit.

Notably, MDOC Policy Directive 03.04.100 provides:

> K.    [The Bureau of Health Care Services ("BHCS")] shall be responsible for the Department's health services program, including coordinating and monitoring all health care services.  Services shall be provided under the direction of the BHCS Administrator, in consultation with the Chief Medical Officer (CMO) and/or Chief Psychiatric Officer (CPO), as applicable, and shall include medical, nursing, dental, psychiatric, psychological, and ancillary services.  However, *all medical, psychiatric, and dental matters involving medical judgment are the sole province of the responsible physician, psychiatrist, or dentist, under the direction of the CMO or CPO, as applicable*.

*    *    *

> EE.    *Health care staff shall ensure that additional necessary services are provided as ordered by a medical provider*.  Additional services that are available include the following:

-16-

      1.     Specialty service appointments. *These appointments shall be scheduled by health care staff as soon as possible after receipt of an approved referral*.

(*Id.* at pgs. 7, 11) (emphasis added). Pursuant to this Policy Directive, health care staff – not the warden – was responsible for making an appointment for Kirkland to see an ophthalmologist. As such, any claim that Kirkland has against Birkett for failing to schedule an ophthalmology appointment fails based on supervisory liability. *See Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) ("[s]ection 1983 liability must be premised on more than mere respondeat superior, the right to control one's employees") (citation omitted).[11]

### b.    *Qualified Immunity*

In the alternative, Birkett says he is entitled to qualified immunity on Kirkland's § 1983 claims. The doctrine of qualified immunity generally shields state actors from liability under § 1983 based on their discretionary acts. *See Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Daugherty v. Campbell*, 935 F.2d 780, 783-84 (6th Cir. 1991). As noted by the Sixth Circuit in *Daugherty*, "[q]ualified immunity entitles its possessor to immunity from suit rather than a mere defense to liability.'" *Id.* at 783 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, government actors have the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole*, 504 U.S. 158, 167 (1992).

---

[11]Kirkland's Complaint does not allege that Birkett was deliberately indifferent to his medical needs by failing to schedule an appointment with an ophthalmologist, but he says Birkett received a letter from Dr. Christianson that suggested that Kirkland see a local opthalmologist.

Government actors may lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Anderson*, 483 U.S. at 638-39; *Harlow*, 457 U.S. at 818. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 819).

Kirkland bears the burden to defeat this immunity, which is a legal issue to be decided by the Court. *See Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). A court must consider: (1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional right has been violated; and, (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are not required to address these questions in sequential order. *Pearson v. Callahan,* 555 U.S. 223 (2009).

"When conducting an inquiry to determine whether a constitutional right is clearly established, the law of our [C]ircuit requires us to look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our [C]ircuit, and finally to decisions of other circuits." *Daugherty*, 935 F.2d at 784 (citations and quotation marks omitted). The standard for qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. . . ." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)) (quotation marks omitted). Thus, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo*, 953 F.2d at 1042. Although it need not be the case that "the very action in question has previously been held unlawful . . . in

the light of pre-existing law the unlawfulness must be apparent." *Id.* Immunity applies if reasonable officials could disagree as to whether the conduct violated Kirkland's rights. *McCloud v. Testa*, 97 F.3d 1536, 1553 (6th Cir. 1996). However, the doctrine offers no protection to "the plainly incompetent or those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In light of the above analysis, this Magistrate Judge finds Birkett should alternatively be entitled to qualified immunity; his actions were not objectively unreasonable in light of clearly established law. *See Rhodes v. Chapman*, 452 U.S. 337, 350 n. 14 ("a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators").

### B.   Broken Ankle

Kirkland alleges in his Complaint that: (1) he "complained to [the] medical department [about the swelling in his left ankle] and requested [his] support boot back until the tennis shoes came"; (2) "Kearney . . . denie[d] [him his] support boot back"; and, (3) "Kearney . . . had no medical authority to take [his] support boot away from [him]" (Dkt. No. 1 at pgs. 14-15).

Kearney does not dispute that the swelling of Kirkland's ankle constituted a serious medical need. Accordingly, this Magistrate Judge assumes that Kirkland's ankle injury was a serious medical condition.

Regarding the subjective element, Kearney argues that Kirkland:

> has only alleged acts which he contends constitute negligence. [Kirkland] has not so much as alleged acts of deliberate indifference. Given the extensive treatment he admits to receiving for his . . . ankle . . ., [Kirkland] could not support such a claim.

\*     \*     \*

-19-

> As to [Kirkland's] left ankle, [Kirkland] alleges that he did not want to continue wearing an open toe support boot, so Mr. Kearney provided him a state shoe and a cane.  Mr. Kearney also ordered Naprosyn for pain and an x-ray of his ankle, but the x-ray showed "nothing."
>
> \*      \*      \*
>
> [Kirkland] has not stated a claim for deliberate indifference to his serious medical needs by Mr. Kearney.  While [Kirkland] may desire more aggressive treatment, [Kirkland] admits that he has been treated by medical providers at [Cental Michigan Correctional Facility].

(Dkt. No. 16 at pgs. 11-12).  Kearney does not address Kirkland's allegation that he was deliberately indifferent to his medical needs when he refused to return his ankle support boot.  In addition, providing Kirkland a walking cane, state-issued shoes (that hurt his ankle), pain medication, and an X-ray of his ankle (with a question of fact regarding the results), does not constitute "extensive" treatment for a possible broken ankle.  And, this Magistrate Judge finds Kirkland's Complaint contains sufficient factual allegations to make a plausible claim regarding Kirkland's broken ankle – not regarding his eye implant or athletes foot; this claim should not be dismissed at this juncture.

## C.    Athlete's Foot

Finally, Kirkland alleges that Dr. Keeling and Kearney were deliberately indifferent to his serious medical needs in their treatment of his athlete's foot.

Kirkland's Eighth Amendment claim fails on the objective element; "the injury [Kirkland] alleges is simply too minor to state an Eighth Amendment claim."  *Florio v. Canty*, No. 12 Civ. 8348, 2013 WL 3781549, at *6 (S.D.N.Y. July 22, 2013) (citing *Partak v. Behrle*, No. 09-CV-1256, 2011 WL 7629500, at *17 (N.D.N.Y. Sept. 12, 2011) ("[T]he shower drain being clogged for three days is unpleasant, inconvenient, and even if plaintiff got athletes foot as a result, does not rise to the level of a denial . . . sufficient to violate the Eighth Amendment."),

*report & rec. adopted*, 2012 WL 1037950 (N.D.N.Y. Mar. 27, 2012); *Purdie v. City of N.Y.*, 10 Civ. 5802, 2011 WL 1044133, at *3 (S.D.N.Y. Mar. 15, 2011) ("A skin rash is generally insufficient to meet the objective requirement of a sufficiently grave and serious condition giving rise to a deliberate indifference claim."); *Thompson v. Carlsen*, No. 08-CV-0965, 2010 WL 3584409, at *14 (N.D.N.Y. Aug. 16, 2010) ("dry, cracked skin and athlete's foot fungus alleged by plaintiff is not the type of 'injury' that gives rise to a valid Eighth Amendment claim"), *report & rec. adopted*, 2010 WL 3584396 (N.D.N.Y. Sept. 7, 2010); *Dolberry v. Levine*, 567 F.Supp.2d 413, 418 (W.D.N.Y. 2008) ("Although plaintiff does allege that he suffered a skin rash due to the lack of showers, that is a *de minimis* injury that does not give rise to a[n Eighth Amendment] claim."); *Swindell v. Supple*, 02 Civ. 3182, 2005 WL 267725, at *7 (S.D.N.Y. Feb. 3, 2005) (plaintiff's "excessive itching, scratching, soreness from scratching, and cracked skin" are not medical conditions "of such an urgent and substantially painful nature as would satisfy the objective prong of the deliberate indifference standard"); *Troy v. Kuhlmann*, 96 Civ. 7190, 1999 WL 825622, at *13 (S.D.N.Y. Apr. 15, 1999) ("[P]laintiff's claims relating to two rashes are insufficient to create an objectively serious medical need as required by the Eighth Amendment."); *see also Calhoun v. Thomas*, 360 F.Supp.2d 1264, 1287 (M.D. Ala. 2005) (athlete's foot cannot be considered an injury serious enough to rise to an Eighth Amendment violation); *Landfair v. Sheahan*, 878 F.Supp. 1106, 1112-13 (N.D. Ill. 1995) (same); *Williams v. Allen County Jail*, No. 1:06-CV-130, 2006 WL 1442154, at *2 (May 25, 2006) ("athlete's foot [is] undoubtedly inconvenient and uncomfortable, but . . . do[es] not constitute a serious medical need.").

-21-

Even if Kirkland could satisfy the first element, his claim fails on the second element – Kirkland received treatment for his condition in the form of cream, antibiotics, and a medicated foot solution soak; his condition was eventually cleared. *See Fyke v. Correct Care Solutions Healthcare*, No. 3:10-0244, 2011 WL 4625636, at *5 (M.D. Tenn. Oct. 3, 2011):

> While Plaintiff asserts that Defendant violated his Eighth Amendment rights, it is undisputed that Plaintiff received medical care that was in accordance with the Jail policies.  It is also undisputed that Plaintiff's condition resolved after treatment in the infirmary and did not return for eight to nine months.  Plaintiff cannot establish that Defendant was in any way deliberately indifferent to a serious medical need.

Kirkland's claims against Dr. Keeling and Kearney relating to his athlete's foot should be dismissed.

## V.      CONCLUSION

Because Kirkland's Complaint only states a plausible claim upon which relief can be granted against Kearney, and there is no question of material fact regarding whether Birkett was deliberately indifferent to Kirkland's medical needs, this Magistrate Judge **RECOMMENDS** that Kearney's motion be **DENIED** (as it relates to the treatment of Kirkland's broken ankle only); and, Dr. Keeling and Birkett's motions be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail

to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  August 14, 2013

### *Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, August 14, 2013, by electronic and/or first class U.S. mail.*

s/Eddrey Butts
*Case Manager to Magistrate Judge Mark A. Randon*